**PRODUCTION CREDIT ASSOCIATION OF SOUTHERN NEW MEXICO,**
Plaintiff–Appellee,

v.

**ALAMO RANCH COMPANY,**
Defendant–Appellant.

No. 92–2008.

United States Court of Appeals,
Tenth Circuit.

March 24, 1993.

Charles W. Cresswell of Cresswell & Roggow, P.A., Las Cruces, NM, for plaintiff-appellee.

Paul L. Biderman (Frederick H. Sherman of Sherman & Sherman, Deming, NM, with him on the brief), Santa Fe, NM, for defendant-appellant.

Before BRORBY, McWILLIAMS and EBEL, Circuit Judges.

BRORBY, Circuit Judge.

Appellant, Alamo Ranch Company (Alamo), appeals a $47,550.63 judgment entered in favor of appellee, Production Credit Association of Southern New Mexico (New Mexico PCA) for accounts receivable generated by the caretaking and feeding of appellant's cattle.

## BACKGROUND

The district court made the following factual findings. In November 1984, John Keck, president of Alamo, entered into an oral agreement with Rolla Hinkle II, president of Chaves County Cattle Corporation (Chaves County Cattle), involving the transfer of 900 head of Alamo cattle to the Chaves County Cattle feedlot. Hinkle indicated that he knew of some investors who would be interested in buying the cattle as "feeder cattle." [1] Under the agreement the feedlot was not only responsible for attempting to sell the cattle, but also agreed to care for and feed the cattle during the interim. Acting in essence as a cattle broker, Hinkle tentatively arranged two or three sales, but each time the deal fell through.

In February 1984, Cattle Complex Corporation (Complex) purchased the real and personal property of Chaves County Cattle. On April 5, 1985, Chaves County Cattle filed a voluntary Chapter XI bankruptcy petition in the Western District of Texas. Subsequently, on April 10, 1985, Complex also filed under Chapter XI, and ultimately both bankruptcy cases were transferred to the District Court of New Mexico. Following the bankruptcy filings, Gary Royal was appointed president of Complex replacing Rolla Hinkle II in managing the feedlot.

Upon assuming the management of the feedlot, Gary Royal became concerned about the size of the feed bill the Alamo cattle had generated during their stay. In May 1985, Royal proposed that Complex would continue to carry the cost of feeding and caring for the cattle until they were sold as "fat cattle." At that point, the feedlot would apply the proceeds from the sale of the cattle to the outstanding feed bill. Royal estimated that it would require one-half of the proceeds to reduce the feed bill to a zero balance.

Based upon Royal's estimation, Alamo agreed to remit to Complex fifty percent of the proceeds it received from purchasers of the cattle. The parties, however, did not contemplate that fifty percent of the proceeds would not cover Alamo's feed bill. The fat cattle market sharply declined in the time period between Royal's estimation and the eventual sale of the cattle. The cattle were finally sold to various purchasers between July and September 1985. Despite the fact that Alamo remitted $230,000, over one-half of the proceeds from the sales, there remained an outstanding feed bill balance of $47,550.63.

---

1. Feeder cattle are cattle pre-sold to investors. An alternative method is for cattle owners to retain ownership of feedlot cattle until sufficiently fattened for slaughter ("fat cattle").

During the period in which the cattle were kept at the feedlot there were thirty-three deaths. This constituted an overall death loss rate of 3.66 percent, whereas a typical death loss rate in the industry would be 1.5–2 percent. No justification for the higher death rate was provided by either party.

In May 1987, Chaves County Cattle, Complex, and New Mexico PCA entered into a settlement agreement in which New Mexico PCA was assigned all of the feedlot's accounts receivable. Although New Mexico PCA gave Alamo the opportunity to top into the settlement agreement, Alamo declined to do so. On May 26, 1988, New Mexico PCA brought suit against Alamo to recover $47,550.63 in accounts receivable plus interest. The suit was brought as a diversity action in the United States District Court for the District of New Mexico.[2]

The district court ruled that New Mexico PCA, as the owner of feedlot's accounts receivable, is entitled to $47,550.63 for the feedlot's performance of its duties of feeding and caring for the cattle under the oral contract between Alamo and the feedlot. The court held the accounts were properly assigned under the bankruptcy laws to New Mexico PCA, and thus New Mexico PCA was the proper plaintiff. The trial court also determined there was no binding agreement between Alamo and the feedlot guaranteeing the feeder cattle would be sold. Additionally, Gary Royal's conversation with Alamo regarding the application of fifty percent of the proceeds to the feed bill did not act as a novation relieving Alamo of its obligation to pay the entire feed bill. Finally, although the court found that an offset for the excessive death loss rate might be cognizable, no such offset was justified given that Alamo could show no breach of contract.

We will consider the following issues on appeal: 1) whether we have appellate jurisdiction; 2) whether the assignment of accounts receivable was ineffective against Alamo, making Chaves County Cattle an indispensable party; 3) whether the district court erred in finding there was no contract to purchase Alamo's cattle; 4) whether the district court erred in finding no novation or substituted executory contract between the parties; 5) whether the district court erred by not allowing an offset for the excessive deaths; and 6) whether the district court erred in awarding interest to the plaintiff.

## APPELLATE JURISDICTION

■ On August 8, 1990, the district court initially entered its Findings of Fact and Conclusions of Law, but did not enter a separate judgment in accordance with Fed. R.Civ.P. 58 and Fed.R.Civ.P. 79(a). Appellants immediately filed a Notice of Appeal and a Motion for Reconsideration. Appellants argued that the court's decision is not appealable without such a judgment, citing Fed.R.App.P. 4(a)(6). On December 24, 1991, we agreed and issued an Order and Judgment (No. 90–2188), 1991 WL 275641, in which we held that appellate jurisdiction could not be exercised as there was no separate final judgment. Relying upon Fed.R.App.P. 4(a)(2) and *FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.,* 498 U.S. 269, ——, 111 S.Ct. 648, 653, 112 L.Ed.2d 743 (1991), we provided: "The premature notice of appeal will ripen after the district court rules on the Motion for Reconsideration and enters final judgment." No. 90–2188, p. 4.

Upon reconsideration the district court entered a Final Judgment on January 6, 1992, in accordance with Fed.R.Civ.P. 58. Defendant again entered a timely notice of appeal stating only: "NOTICE of appeal is hereby given from the 'Final Judgment' entered the the [sic] 6th of January, 1992 (copies attached)." Because the body of the notice did not reference which party was appealing the judgment in accordance with Fed.R.App.P. 3(c), the appellee contends that we lack appellate jurisdiction under *Torres v. Oakland Scavenger Co.,*

---

**2.** The complaint was filed before the minimum amount in controversy requirement was raised from $10,000 to $50,000. 28 U.S.C.A. § 1332 (Supp.1992); *see* Pub.L. 100–702 § 201(a), (b) (1988).

487· U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988).

■ We believe it is unnecessary to address the *Torres* issue because the appellant's first Notice of Appeal ripened upon the district court's entry of final judgment, as provided in the Order and Judgment. Fed.R.App.P. 4(a)(2) provides: "Except as provided in (a)(4) of this Rule 4,[3] a notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof." Generally, a liberal approach is followed in interpreting 4(a)(2). *A.O. Smith Corp. v. Sims Consol. Ltd.*, 647 F.2d 118, 120 (10th Cir.1981). "Rule 4(a)(2) permits a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that *would* be appealable if immediately followed by the entry of judgment." *FirsTier*, 498 U.S. at ——, 111 S.Ct. at 653. Our initial Order and Judgment determined the district court's Findings of Fact and Conclusions of Law would have been appealable, and thus the Defendant reasonably filed a protective notice of appeal which ripened upon final judgment. Consequently, it is unnecessary to consider the adequacy of the second notice of appeal under *Torres*.

### VALIDITY OF ASSIGNMENT

■ Turning to the merits, Alamo contends the assignment of accounts from Complex and Chaves County Cattle to New Mexico PCA was invalid as applied to Alamo because they did not receive formal notice. The trial court factually found that on May 18, 1987, the feedlot assigned all accounts receivable owned by Chaves County Cattle or Complex to New Mexico

PCA in a settlement agreement, and such agreement was approved by the bankruptcy court on August 31, 1987. By a letter dated November 3, 1987, New Mexico PCA demanded payment from Alamo and informed them of the settlement agreement. The standard of review for factual determinations is clearly erroneous. *See Sanchez v. Bond*, 875 F.2d 1488, 1495 (10th Cir. 1989), *cert. denied*, 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990). The findings are supported by the record and are not clearly erroneous.

■ The letter of November 3, 1987 constitutes adequate notice to Alamo that its accounts with Complex and Chaves County Cattle were assigned to New Mexico PCA. It is well established that "notice to debtor of an assignment is necessary to impose upon the debtor an obligation of payment to the assignee." *S & W Trucks, Inc. v. Nelson Auction Serv., Inc.*, 80 N.M. 423, 425, 457 P.2d 220, 222 (1969). Thus, Alamo's obligation to make payment to New Mexico PCA arose upon receipt of the letter. If Alamo had paid the feedlot after the assignment but before notification, it might be relieved of liability to New Mexico PCA. Alamo, however, has demonstrated no prejudice from the six-month delay in the notification of the assignment because it paid neither the assignor (the feedlot) nor the assignee (New Mexico PCA). Therefore, the district court was not clearly erroneous in finding the assignment was valid and consequently Chaves County Cattle is not an indispensable party.

### DOES CONTRACT GUARANTEE IMMEDIATE SALE OF CATTLE

■ Appellant next contends the district court· erred in its finding of fact that Rolla

---

**3.** Fed.R.App.P. 4(a)(4) provides:

If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting

or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above.

Apparently, in the Order and Judgment we did not view appellant's Motion for Reconsideration as one of the motions described in Rule 4(a)(4). Therefore, the premature filing of the appeal is governed by Rule 4(a)(2).

Hinkle II, on behalf of Chaves County Cattle, never guaranteed the immediate sale, nor alternatively, promised to buy Alamo's cattle. The district court made the following finding: "At no time, however, did Hinkle promise on behalf of Complex or Chavez County Cattle Company to buy Alamo Ranch cattle, nor did he assure or otherwise guarantee the sale of the cattle placed by Alamo Ranch at the feed lot." Instead, the terms of the agreement provided that "Alamo Ranch should ultimately transport approximately 900 head of its cattle to the feed yard, that the feed yard should oversee the care and feeding of such cattle, and that Hinkle should attempt to sell the cattle as 'feeder' cattle." The trial court's interpretation of the terms of a contract is factual and cannot be set aside unless it is clearly erroneous. *Chaparral Resources, Inc. v. Monsanto Co.*, 849 F.2d 1286, 1289 (10th Cir.1988).

There was no enforceable contract between Alamo and the feedlot for the outright purchase of the cattle. Such a contract would have to be in writing as mandated by the statute of frauds. *See* N.M.Stat.Ann. § 55–2–201 (Michie 1978). Appellant asks us to transform Hinkle's assurance that he could quickly sell the cattle into a term of the contract. Hinkle's assurance of a quick sale is more properly characterized as a prediction rather than an enforceable guarantee. Consequently, the district court's finding that Hinkle's obligation under the contract, on behalf of the feedlot, was merely to attempt to sell the cattle was not clearly erroneous.

### NOVATION

■ Appellant alternatively alleges there was a novation of the original contract. Alamo contends the phone conversation between Keck and Gary Royal established a new agreement whereby Alamo would remit to the feedlot one-half of the proceeds from the ultimate sale of the cattle thereby extinguishing its feed liability. Instead, the district court made the factual finding that the "feed bill owed by Alamo Ranch would be paid in its entirety, and that the parties did not mutually agree that the

indebtedness of Alamo Ranch would be satisfied in the event that the 50% share of the proceeds from the sale of the fat cattle failed to reduce the feed bill balance to zero." Once again, we review this finding for clear error.

■ In order to find a novation there must be: 1) an existing and valid contract; 2) an agreement to the new contract by all the parties; 3) a new valid contract; and 4) an extinguishment of the old contract by the new one. *Maulsby v. Magnuson*, 107 N.M. 223, 226, 755 P.2d 67, 70 (1988). We have already recognized that there was an existing contract between the parties. The contract provided that the feedlot would perform caretaking and feeding services in exchange for compensation. Alamo contends the phone conversation constituted a new agreement where the feedlot would be compensated in direct proportion to the proceeds generated from the cattle sale. The district court, however, expressly found Gary Royal's testimony more credible. Royal testified the arrangement was not intended to relieve Alamo of its obligation to pay the feed bill in its entirety. Moreover, the parties never addressed the possibility that fifty percent of the proceeds might not cover the feed bill. The conversation is more accurately characterized as an agreement for method of payment rather than a new contract. Therefore, the plaintiff cannot show the second element necessary for a novation, an agreement to a new contract by all parties. Consequently, the third and fourth elements also fail. Thus, we cannot say the finding of no novation was clearly erroneous.

### OFFSET

■ Alamo argues they should have been awarded an offset for the excessive death rate suffered by the cattle. The district court held an offset is legally cognizable under an equitable recoupment defense or under the theory that Alamo was a creditor whose claim was not discharged by the bankruptcy court due to lack of notice. No cross-appeal challenging the viability of these theories was filed, so we

will assume that an offset is legally cognizable and turn to the merits.

■ The district court found a 3.66 percent overall death loss rate among the Alamo cattle during the time the cattle were at the feedlot, as opposed to a typical rate of 1.5–2 percent in the industry. Emphasizing that Alamo cattle had previously proven to be hearty, the judge held that an even lower death rate might be expected. Ultimately, the court denied relief finding insufficient evidence to support the claim of "negligent performance of the contract." The New Mexico Supreme Court recognizes negligent performance of a contract as a cause of action. *Wendenburg v. Allen Roofing Co.*, 104 N.M. 231, 232, 719 P.2d 809, 810 (1986). We interpret this phrase as an action for breach of contract when one party fails to execute their promises in a reasonable, workmanlike manner. In this case, there was no breach of the contract since Alamo failed to prove facts which would indicate the feedlot was not reasonably prudent in caring for the cattle. Alamo has continually pursued this as a breach of contract claim. The pretrial order also reflects that the excessive death loss contention is brought under a breach of contract theory. Our review of findings regarding a breach of contract is guided by the clearly erroneous standard. *Chaparral*, 849 F.2d at 1289.

■ A person who cares for and feeds the animals belonging to another is called an agistor. Because many contracts involving agistors are not reduced to writing, a common law standard for the duty of care owed by the agistor to the animal owner has evolved. Under New Mexico law, the rule is stated as follows:

"In the absence of special agreement, an agistor is bound to exercise ordinary diligence in keeping, feeding, sheltering, and otherwise caring for animals committed to his custody, and is liable for loss or injury to the animals resulting from his breach of such duty; exercise of ordinary care satisfies the agistor's obligation, he is not an insurer; and he may not be held responsible for loss or damage occurring without his fault."

*Lujan v. McCuistion*, 55 N.M. 275, 276, 232 P.2d 478, 479 (1951) (quoting 3 C.J.S. *Animals* § 17(c)). There was no special agreement regarding excessive deaths in this contract. Despite the finding of an unusually high mortality rate, the appellant failed to present any evidence showing the feedlot did not exercise ordinary care. In a breach of contract action there must be proof that a breach occurred before relief can be granted. *Naranjo v. Ortiz*, 94 N.M. 393, 394, 611 P.2d 216, 217 (1980). This burden was not met at the trial level, as the court found that merely proving an excessive death rate was insufficient to establish such a breach. We do not believe such a finding was clear error.

■ Normally, the agistor situation is analyzed under a bailment theory. Appellant presents the theory of bailment in its brief to this court. In a bailment analysis, if property is delivered to the bailee in good condition and then becomes damaged, "there arises a presumption that the bailee is negligent and it casts upon the bailee the burden of going forward with evidence to overcome the presumption." *New Mexico Feeding Co. v. Keck*, 95 N.M. 615, 620, 624 P.2d 1012, 1017 (1981). Thus, typically the agistor has the burden of showing the exercise of ordinary care. The theory of bailment, however, was never raised at the trial level. Since bailment was not argued it was unnecessary for the feedlot to present evidence demonstrating the exercise of ordinary care to overcome the presumption of negligence. This is not the forum to debate whether the feedlot should be liable as a bailor, since the evidence necessary in making this determination was not developed in the record. Matters not presented to the trial court for consideration are generally not considered by this court. *United States v. Immordino*, 534 F.2d 1378, 1381 (10th Cir.1976). Consequently, we are limited to considering the breach of contract claim.

## INTEREST

■ Finally, Alamo contends the trial court improperly awarded fifteen percent interest on the contract to the plaintiff.

Although New Mexico PCA asked for interest in the complaint, appellant argues such a demand was not clear in the pretrial order and is therefore waived. Moreover, they alternatively counter that there was a modification of the agreement in which the parties orally waived the charging of interest. Finally, they contend interest should only be charged from November 3, 1987, the date payment was demanded as opposed to October 1, 1985, the date the court imposed.

Omitting the demand for interest from the pretrial order does not preclude the award of interest since the demand was made in the complaint. "Pursuant to Fed. R.Civ.P. 54(c), prejudgment interest will be allowed as part of the final judgment where a request for same is made in the complaint." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1401 (6th Cir.1990) (citing *Shearson/American Express Inc. v. Mann*, 814 F.2d 301, 307 (6th Cir.1987)), *cert. denied*, —— U.S. ——, 111 S.Ct. 952, 112 L.Ed.2d 1041 (1991).

 Alamo argues that notes from a telephone conversation scribbled by its employee Keck constitute uncontroverted evidence that the parties agreed to waive interest charges indefinitely. Obviously, the district court did not find this evidence credible and assigned interest charges at the rate of fifteen percent in accordance with New Mexico law. "The rate of interest, in the absence of a written contract fixing a different rate, shall be not more than fifteen percent annually ... (A) on money due by contract." N.M.Stat.Ann. § 56–8–3 (Michie 1978). It was within the district court's discretion to disbelieve evidence of an alleged oral waiver, and to award interest in compliance with the statute.

 The law in New Mexico regarding the award of prejudgment interest is clear. "[P]rejudgment interest should be awarded as a matter of right where the defendant has breached a contract to pay a definite sum of money." *Ranch World of New Mexico, Inc. v. Berry Land & Cattle Co.*, 110 N.M. 402, 404, 796 P.2d 1098, 1100 (1990). Furthermore, interest should be assigned from when the amount due under the contract can be ascertained with reasonable certainty. *Kueffer v. Kueffer*, 110 N.M. 10, 12, 791 P.2d 461, 463 (1990). Since the last of Alamo's cattle were sold just prior to October 1, 1985, it was appropriate to start the accrual of interest from that date.

The judgment of the district court is hereby AFFIRMED.