KAREN NELSON MOORE, Circuit Judge,
concurring in part and dissenting in part.
The majority ably lays out the three questions in this case: (1) whether the district court erred in holding Bischer Farms, Inc. liable to Scarff Brothers, Inc. *526 (“Scarff Bros.”) for breach of contract; (2) whether the district court erred in holding Bischer Farms Partnership successively liable to the corporation; and (3) whether the district court erred in holding Bischer Farms, Inc.’s three related businesses, the four LLCs, and the four individual defendants liable as alter egos of the corporation. I agree with the majority that the district court could not apply successor liability without finding that the corporation had transferred assets to the partnership and that it could not pierce the corporate veil without a finding of fraud. Because I believe that the district court’s factual findings do not support the precise breach of contract described in the district court’s opinion, however, I respectfully dissent. I also write separately with regard to successor liability because I believe that the district court must make an additional finding before holding the partnership liable: it must conclude that the corporation is judgment-proof.
I. Breach of Contract
Scarff Bros, claims that the disappearance of 491 head of cattle constituted a breach of contract by Bischer Farms, Inc. Resolving this claim involves two questions: what promises with regard to the cattle did Bischer Farms, Inc. make in its contract with Scarff Bros., and what happened to the cattle. Bischer Farms, Inc. argues that it agreed to exercise due care in finishing the cattle to market, that most of the cattle died, and that it cannot be liable for those deaths absent a finding of fault on its part.[6]
The district court found that Bischer Farms, Inc. agreed “to feed, maintain, and finish to market” Scarff Bros.’s cattle and that Bischer Farms, Inc. breached the agreement when 491 cattle disappeared because it failed to provide the contracted service for those 491. Scarff Bros., Inc. v. Bischer Farms, Inc., 546 F.Supp.2d 473, 487 (E.D.Mich.2008). The district court did not decide what actually became of the missing cattle — whether they died, were stolen by Duane Geiger, were converted and sold by Bischer Farms, Inc., or simply broke away to freedom on their own— because it did not have to. Its finding as to the terms of the implied contract mooted that question. In holding Bischer Farms, Inc. in breach based on the unaccounted-for disappearance of the cattle and in assessing the entire value of the 491 head as damages, the district court found that Bischer Farms, Inc. had agreed to feed and finish to market the cattle no matter what. On this theory, even if some of the cattle died on the feedlot through no fault of Bischer Farms, Inc. — a possibility that, notwithstanding the majority’s suggestion to the contrary, the district judge did not rule out[7] — Bischer Farms, Inc. would be liable for their value.
*527 The evidence reviewed by the district court, however, does not support such an agreement. In describing the parties’ course of dealing, the district court reviewed their practice only as to the maximum cost of gain per pound, insurance, and veterinary care; delivery of the cattle to the lot; selection of which cattle were ready for sale; and arrangement for transportation to the slaughterhouse. Id. at 479-81. The district court noted that the parties kept track of dead cattle, but it made no finding of under what circumstances Bischer Farms, Inc. had to compensate Scarff Bros, for those dead cattle. The court observed that Bischer Farms, Inc. “secured” insurance for the cattle, id. at 487, but this fact alone does not support a finding of 100% liability for death loss because there is no evidence as to the terms of that insurance.
Four facts suggest that the parties did not intend Bischer Farms, Inc. to be fully liable when the loss resulted from death. First, the district court noted that, in the monthly bills issued to Scarff Bros., Bischer Farms, Inc. would reduce the balance by costs not incurred for cattle that had died. Id. at 480-81. The district court did not state that Bischer Farms, Inc. would reduce the costs by the actual value of the cattle, such that it was insuring Scarff Bros, for the loss. Second, the district court found that Scarff Bros, collected data about cattle death loss “so that it could seek financial credits from the seller of cattle that had died, if warranted.” Id. at 482 (emphasis added). This statement in-
dicates that Scarff Bros, had not simply shifted 100% of the risk of death loss to Bischer Farms, Inc. and that Scarff Bros, anticipated that it might have received unhealthy cattle in the first place. Third, the parties shared the cost of veterinary care, again indicating that Bischer Farms, Inc. had not assumed complete liability for the well-being of the cattle. Fourth, the district court noted that, in or around March 2003, the parties worked to memorialize their agreement in a written contract. Though they never finalized the document, the parties appeared to agree on a draft provision stating the following under the heading “death loss”: “OWNER bears all risk of loss or damage to the cattle except for loss or damage caused by FEEDER’S breach of this agreement, or negligence or other fault of FEEDER. OWNER accepts all economic loss resulting from death of the CATTLE.” Id. at 486 n. 8. The provision also called for Bischer Farms, Inc. to compensate Scarff Bros, for death loss exceeding 3% and up to 5% of the total head. Id. The district court described this as an example of the parties’ mutual agreement, but it did not clarify whether the provision reflected their prior course of dealing.
Thus, the facts do not support the district court’s view that Bischer Farms, Inc. had agreed to compensate Scarff Bros, for any and all cattle not finished to market, including those that died. Exactly what Bischer Farms, Inc. had agreed to do with *528 regard to death loss, then, has not been determined.[8]
The defendants ask that we hold as a matter of law that Bischer Farms, Inc. had agreed to be liable only to the extent that it did not exercise due care. Their logic is that the facts show that the parties had entered into a contract for agistment, a type of bailment, and that under state law, an agistment contract imposes on the bail-ee a duty of reasonable care.[9] For this proposition, they cite a Tenth Circuit case applying New Mexico law, a Vermont Su-' preme Court case, and the American Jurisprudence legal encyclopedia. See Prod. Credit Ass’n of S. N.M. v. Alamo Ranch Co., 989 F.2d 413, 419 (10th Cir.1993) (holding that party that had agreed orally to feed, care for, and attempt to sell 900 head of cattle was an agister and thus had a common-law duty to exercise ordinary care, absent a special agreement); Butterfly v. Marcell, 134 Vt. 511, 365 A.2d 252, 253 (1976) (holding that party to whom pony was entrusted under an oral contract of agistment was not liable for pony’s death after pony was struck by an automobile because no facts supported a finding of negligence or want of ordinary care); 4 Am.Jur.2d Animals § 57 (stating that under a contract of agistment, “[a]n agister is bound to take reasonable or ordinary care of the animals committed to his or her charge, but in the absence of a special contract, he or she is not an insurer of their safety”). This appears to be the default duty that the Michigan Supreme Court would apply, as well. See Costello v. Ten Eyck, 86 Mich. 348, 49 N.W. 152, 153 (1891) (holding that defendant who took horses for pasture, “[hjaving taken the horse into his possession, though under a void contract, ... yet owed a duty to the plaintiff to exercise some degree of care over it”); 94 A.L.R.2d 319 (citing cases establishing that this is the general rule among the states).
It would be inappropriate, however, for us to determine as a matter of law what the parties agreed to with respect to death loss. That is a factual question that depends on the course of conduct between the parties, an issue for the district court. The case should thus be remanded for the district court to determine the liability rule agreed to by the parties for cattle deaths, how many cattle died, and what part of the death loss Bischer Farms, Inc. must cover based on the agreed-on liability rule.
Finally, I note that Scarff Bros, argues that the facts brought out at trial support three discrete breaches by Bischer Farms, Inc.: “(i) failing to account for 491 head of *529 Scarff Bros.’ cattle, (ii) failing to report cattle that allegedly died to Scarff Bros., and (iii) charging Scarff Bros, [for] feeding cattle that were known by Bischer Farms to be missing.” Appellee’s Br. at 11. I agree that the facts support each of these alleged breaches. But this does not resolve the case because these proffered breaches do not support the damages calculated by the district court. They warrant compensation for such things as the opportunity cost of not replacing the dead cattle with new ones that could have been finished to market and the cost of feed that should not have been charged. Scarff Bros, can recover for the actual value of the cattle only if Bischer Farms, Inc. agreed to bear the loss of that cattle or if the loss was its fault.
For these reasons, I dissent from the majority’s affirmance of the district court’s breach-of-contract determination.
II. Successor Liability
The majority remands because “it is not clear from the district court’s opinion whether or not any transfer of assets took place between Bischer Farms, Inc. and Bischer Farms Partnership.” Maj. Op. at 524. I agree and add that an additional finding is necessary before successor liability will apply: there must be some reason that Scarff Bros, cannot recover in full from Bischer Farms, Inc.
In Antiphon, Inc. v. LEP Transport, Inc., 183 Mich.App. 377, 454 N.W.2d 222 (1990), the court addressed “whether the doctrine of estoppel may be harmonized with any of the exceptions to the general rale against successor liability.” Id. at 225. One of those exceptions is “when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation”; another is “when the new corporation is a mere continuance of the old.” Id. at 224-25. The elements of estoppel, meanwhile are: “(1) a party by representations, admissions or silence induces another party to believe facts; (2) the other party detrimentally relies and acts on this belief; and (3) the other party will be prejudiced if the first party is allowed to deny the existence of the facts.” Id. at 225. The Antiphon court concluded that the implied-assumption exception and estoppel could indeed be reconciled:
We believe that the rationale underlying an application of the doctrine of estoppel and the implied agreement to assume liability exception are the same — that rationale being that a party may not, by its conduct or silence, assume a position that if maintained would result in an injustice to another. Accordingly, we conclude that when the trial court found that Antiphon was es-topped from denying successor liability it, in actuality, was deciding that Antiphon’s conduct gave rise to an implied acceptance of liability and that LEP was reasonable in relying on this implied acceptance to its detriment.
Id. (emphases added). Combining the exceptions and estoppel doctrine, the Antiphon court thus held that a party can recover when it reasonably relies to its detriment on an apparent acceptance of liability. Id. In Antiphon, LEP reasonably relied to its detriment on the apparent transfer of liability from Seamco to Antiphon when LEP forewent certain remedies against Seamco and Seamco ultimately dissolved. The district court in the instant case did not say the same about Scarff Bros. Bischer Farms, Inc.' is an extant and operational corporation. Scarff Bros, was able to bring suit against Bischer Farms, Inc. And there is no indication that the corporation is judgment-proof. See Traverse City Auto Mall v. Wolverine Auto Supply, Inc., Nos. 226824, 227554, *530 2002 WL 1797252, at *2 (Mich.Ct.App. Aug.2, 2002) (unpublished opinion) (reading Antiphon as “stating that a court of equity should imply an assumption of liability by a successor corporation if the facts show that the predecessor is uncol-lectible ... ”). On remand, if the district court finds that a transfer of assets took place, it should not find Bischer Farms Partnership successively liable unless it also finds that Scarff Bros, will be prejudiced if it is limited to recovering against Bischer Farms, Inc.

. I disagree with the majority's characterization of Bischer Farms, Inc.'s position as arguing that it "cannot be held liable for the missing cattle because the duty of care required of [it] was governed by agistment law, not the contract.” Maj. Op. at 521. Bischer Farms, Inc. acknowledges that "the nature and scope of the obligations owed by the parties to each other are defined by contract,” Appellants' Br. at 12, but it contends that the contract incorporated the duty of care generally applicable in contracts for agistment. Bischer Farms, Inc. argues, in effect, that where cattle loss was concerned, it agreed to be liable only to the extent that it was at fault. Of course, as the majority correctly points out, agisters by contract can take on duties greater than those imposed at common law. The dispositive issue in this case, then, is what duty did Bischer Farms, Inc. agree to take on under the implied contract?

. Had the district court found that none of the missing cattle had died and that they instead had been stolen, Bischer Farms, Inc. would have no argument on appeal. Whether Bischer Farms, Inc. agreed to be liable for any and all deaths or only those that it caused *527 would be immaterial if there were no deaths. But here the district court made no such finding. It is true that the district court rejected Bischer Farms, Inc.’s contention that 345 cattle died and that Scarff Bros, knew of the deaths. Scarff Bros., 546 F.Supp.2d at 483-84. But the district court also stated that "[wjhether Bischer Farms maintained the 491 head of cattle or otherwise benefited from them ... was not demonstrated by Scarff Brothers’ proof,” indicating that the court believed the cattle had not simply all been converted. Id. at 484. Furthermore, the district court wrote that it did not "accept the Bischers’ ever-evolving theory that the missing cattle were necessarily dll in the compost-er decomposing,” id. at 487 (emphasis added), suggesting that it believed that some of the 491 had died.

. The majority writes that "[i]f Defendants had produced reliable evidence that some or all of those 491 cattle had, in fact, died, then an analysis of the contract's division of death-loss liability would be required." Maj. Op. at 522. The majority agrees, then, that Bischer Farms, Inc. did not promise to finish all cattle to market regardless of the circumstances. Because the district court treated Bischer Farms, Inc. as having made precisely this one-sided commitment (and therefore made no finding of what happened to the cattle), we must reverse.

. Scarff Bros, contends that by failing to raise the issue at the district court, the defendants waived their argument that bailment law applies because the contract was one of agistment. It is true that the defendants did not frame the case this way below, and defense counsel actually wrote in his final filing before judgment, "[hjere there is a Contract in place and there is no bailment.” Mem. at Conclusion of Trial at 14 (R.E. # 157). However, in the same brief, defense counsel described as a "fiction” the claim that “491 head are the absolute and total responsibility of Bischers, regardless of what happened to them.” Id. at 11-12. Thus, the district court should have been alerted to the need to determine, based on the default rule for agistments and any other evidence, what level of risk Bischer Farms, Inc. agreed to take on.